# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                            Case No. 17-CR-224

RICKI A. MAHKIMETAS, JR.,

    Defendant.

## ORDER DENYING MOTION TO SUPPRESS

On December 19, 2017, a grand jury returned an indictment charging Defendant Ricki A. Mahkimetas, Jr., a Native American Indian, with two counts of attempted aggravated sexual abuse involving children under the age of twelve within the boundaries of the Menominee Indian Reservation in violation of 18 U.S.C. §§ 2241 and 1153. A superceding indictment returned on February 14, 2017, added a similar third count. The case is before the court on Mahkimetas' motion to suppress the statement he gave to law enforcement on or about December 21, 2017, as he was being transported from the tribal jail to federal court for his initial appearance. Mahkimetas claims that the statement was taken when law enforcement initiated further interrogation with him after he had previously invoked his right to counsel in violation of the bar to further questioning established in *Arizona v. Edwards*, 451 U.S. 477, 484–85 (1981). Alternatively, Mahkimetas argues, based on the fact that he had previously been charged in tribal court with essentially the same charges, that law enforcement violated his Sixth Amendment right to counsel. For the reasons that follow, Mahkimetas' motion is denied.

## I. BACKGROUND FACTS

The material facts are not in dispute; most were stipulated. Mahkimetas was first interviewed by FBI Special Agent Sarah Deamron and Tribal Detective Todd Otradovec about the events underlying the charges on September 5, 2017. Mahkimetas was in custody at the Menominee Tribal Police Department at the time and was advised of his Miranda rights. He initially waived his rights and agreed to answer questions. At some point, however, he changed his mind, and clearly and unequivocally invoked his right to counsel. The interview was immediately terminated, and Mahkimetas was returned to the Tribal Jail in the same building.

Mahkimetas was released from tribal custody to the community on October 7, 2017. On October 25, 2017, Mahkimetas was arrested on tribal charges for the same conduct and placed in the Menominee Tribal Jail where he remained in custody on a cash bond. On December 19, 2017, the grand jury sitting in Milwaukee indicted him on federal charges arising out of the same conduct. Two days later, on December 21, 2017, Mahkimetas was transported by SA Deamron and Detective Otradovec from the Menominee Tribal Jail to the district court in Green Bay for his initial appearance on the federal charges.

The district court in Green Bay is about an hour drive from the Menominee Tribal Jail. After he was retrieved from the Tribal Jail, Mahkimetas was handcuffed and placed in the back seat of SA Deamron's F150 pick-up truck with Detective Otradovec seated next to him. SA Deamron drove. As they left the jail, SA Deamron explained to Mahkimetas where they were going and what would occur. She told him he had been indicted on two counts of sexual abuse of a minor and he would be transported to Green Bay for his initial appearance, where he would have his initial appearance. Further into the drive, SA Deamron explained to Mahkimetas that he would have a right to a trial

2

and that if he went to trial "the three little girls would be brought in and would testify to the acts that happened to them that he was charged with." SA Deamron also told Mahkimetas that it would be beneficial to him to admit what he had done and this was his opportunity to do so. She explained that she didn't want the girls to have to testify.

Detective Otradovic likewise spoke with Mahkimetas about the importance of helping himself. There was also some discussion of the cultural traditions they shared, and Mahkimetas said he had been reading the Bible. Detective Otradovic suggested that religion and the native cultural traditions can help in dealing with the difficulties he was facing. Mahkimetas seemed receptive to what Detective Otradovic was saying and seemed less subdued. A little more than half-way into the drive, Mahkimetas told Detective Otradovic that he wanted to make a statement but would first like to smoke a cigarette.

Detective Otradovic conveyed Mahkimetas' request to SA Deamron, and she pulled off the highway at a gas station to buy some cigarettes. When she returned to her truck, she gave Mahkimetas a soft drink and turned on her recording device. As SA Deamron pulled back onto the highway, Detective Otradovic read Mahkimetas his *Miranda* rights, which he waived. Mahkimetas then proceeded to make a recorded statement about the offenses with which he was charged. When they arrived at the federal courthouse in Green Bay, Mahkimetas was allowed to smoke a cigarette before they entered. It is the audio recorded statement taken on the way to court that Mahkimetas now moves to suppress on the ground that it was obtained in violation of the rights established in *Miranda v. Arizona*, 384 U.S. 436 (1966), and *Arizona v. Edwards*, and his Sixth Amendment right to counsel.

3

## II. DISCUSSION

It should be noted at the outset that Mahkimetas does not offer any argument that his confession was coerced or resulted from the infliction of physical pain or discomfort. In other words, he does not contend that his statements were compelled; that he was forced to confess. To the contrary, the evidence suggests the primary appeal by the officers was more moral than physical. Mahkimetas' arguments for suppression are instead based upon the technical application of the set of prophylactic rules created by the Court to insure coercive measures by law enforcement are not used. As explained below, I conclude that his arguments rest on a misapplication of those rules.

### A. Fifth Amendment and Waiver of *Miranda* Rights

In *Miranda v. Arizona*, the Court adopted a set of prophylactic measures that law enforcement officers are required to comply with in order to protect a suspect's Fifth Amendment right from the "inherently compelling pressures" of custodial interrogation. 384 U.S. at 467. The primary requirement adopted by the Court is that before the interrogation begins, the officer must give the suspect the familiar *Miranda* warnings and obtain a knowing and voluntary waiver of the suspect's right to remain silent and his right to have an attorney assist him, even if he cannot afford to hire one on his own. *Id.* at 473–75. In *Edwards*, the Court added to the protections afforded a suspect in *Miranda* by requiring additional safeguards after the suspect invokes his right to counsel:

> [W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights . . . . [He] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

451 U.S. at 484–485.

Mahkimetas contends that SA Deamron and Detective Otradovic violated his rights under *Edwards* in the course of transporting him to court by subjecting him to further custodial interrogation after he invoked his *Miranda* right to counsel when he was first questioned about the events underlying the charges on September 5, 2018. In Mahkimetas' view, the case presents on the surface a simple application of *Edwards*. Mahkimetas invoked his right to counsel on September 5, 2017, and the officers terminated the interview. The same officers returned on December 21, 2017, and proceeded to re-interview him on the drive to the federal court in Green Bay. Mahkimetas was not provided counsel in the interim, nor did he initiate the second interview.

As Mahkimetas also recognizes, however, his argument is made far more difficult by the Court's post-*Edward* decision in *Maryland v. Shatzer*, 559 U.S. 98 (2010). In *Shatzer*, the Court observed that the bar it created in *Edwards* was intended to protect the suspect who had been arrested for a particular crime and then held in uninterrupted pretrial custody while that crime is being actively investigated. "After the initial interrogation, and up to and including the second one, he remains cut off from his normal life and companions, thrust into and isolated in an unfamiliar, police-dominated atmosphere where his captors appear to control [his] fate." *Id.* at 106 (internal quotations and citations omitted). Referencing the three prior cases applying the bar, the Court observed that "[n]one of these suspects regained a sense of control or normalcy after they were initially taken into custody for the crime under investigation." *Id.* at 107.

The Court declined in *Shatzer* to extend the *Edwards* bar to further questioning beyond the circumstances justified by its "prophylactic purpose." *Id.* at 106. The Court noted that when, unlike the petitioner in *Edwards*, "a suspect has been released from his pretrial custody and has returned to his normal life for some time before the later attempted interrogation, there is little reason to think

5

that his change of heart regarding interrogation without counsel has been coerced." *Id.* at 107. The Court then went on to explain:

> [The suspect] has no longer been isolated. He has likely been able to seek advice from an attorney, family members, and friends. And he knows from his earlier experience that he need only demand counsel to bring the interrogation to a halt; and that investigative custody does not last indefinitely. In these circumstances, it is farfetched to think that a police officer's asking the suspect whether he would like to waive his *Miranda* rights will any more wear down the accused . . . than did the first such request at the original attempted interrogation—which is of course not deemed coercive. His change of heart is less likely attributable to "badgering" than it is to the fact that further deliberation in familiar surroundings has caused him to believe (rightly or wrongly) that cooperating with the investigation is in his interest. Uncritical extension of *Edwards* to this situation would not significantly increase the number of genuinely coerced confessions excluded.

*Id.* at 107–08 (internal quotations and citations omitted).

At the same time that the rationale for the rule is significantly diminished with the passage of time, the Court noted the cost of the rule—excluding voluntary confessions from trial—remains high. *Id.* at 108. With these considerations before it, the Court in *Shatzer* set a 14-day time limit after release from custody for the duration of the bar to further police initiated questioning when a suspect invokes his right to counsel during a custodial interrogation. Fourteen days, the Court held, "provides plenty of time for the suspect to get reacclimated to his normal life, to consult with friends and counsel, and to shake off any residual coercive effects of his prior custody." *Id.* at 110.

Mahkimetas invoked his right to counsel on September 5 and was released from custody on October 7, 2017. He remained free until October 25, 2017, some eighteen days later, and was not questioned again until December 21, 2017, approximately 107 days after the first interview. As Mahkimetas realizes, given these facts, *Shatzer* presents an obvious obstacle to his claim under *Edwards*. Mahkimetas attempts to overcome this obstacle by arguing that in *Shatzer* the interval was two-and-a-half years instead of the shorter time span here. Mahkimetas also notes that unlike the

6

suspect in *Shatzer*, the same officer, SA Deamron, was involved in both interviews and thus had personal knowledge that he had previously invoked his right to counsel. Another difference Mahkimetas points to is that unlike *Shatzer*, both interviews in this case were about the same conduct for which charges were pending in tribal court. Finally, Mahkimetas notes he was back in jail at the time he was again questioned.

None of the differences Mahkimetas cites to distinguish the facts of this case from *Shatzer* warrant a different result. The Court's express intent in *Shatzner* was to create a bright-line rule so that law enforcement would know how long they had to wait before initiating further contact with a suspect: "It is impractical to leave the answer to that question for clarification in future case-by-case adjudication; law enforcement officers need to know, with certainty and beforehand, when renewed interrogation is lawful." *Id.* at 110. The Court therefore concluded that "when it is determined that the defendant pleading *Edwards* has been out of custody for two weeks before the contested interrogation, the court is spared the fact-intensive inquiry into whether he ever, anywhere, asserted his *Miranda* right to counsel." *Id.* at 111–12. In this case, it is undisputed that Mahkimetas was out of custody for more than fourteen days after he invoked his right to counsel at a custodial interview. *Edwards* therefore does not apply. I decline to engage in the fact-intensive analysis Mahkimetas' argument invites but which *Shatzer* was intended to avoid. Because Mahkimetas' subsequent waiver of his *Miranda* rights was knowing and voluntary, and his resulting statement was likewise voluntary and uncoerced, his motion to suppress on grounds that his Fifth Amendment rights were violated fails.

**B. Sixth Amendment Right to Counsel**

Mahkimetas next argues that his statement was obtained in violation of his Sixth Amendment right to counsel. The Sixth Amendment states as relevant here: "In all criminal prosecutions, the

7

accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." In *Michigan v. Jackson*, the Court held that the Sixth Amendment right to counsel attaches at the defendant's arraignment. 475 U.S. 625, 629–30 (1986). The Court further held in *Jackson* that once a defendant's Sixth Amendment right to counsel attached, a prophylactic rule barred police from approaching represented defendants. *Id.* at 636. It is that rule that Mahkimetas seeks to assert here. Although he had not yet been arraigned on the federal charges, Mahkimetas argues that he also has a right to counsel, albeit at his own expense, under the Menominee Tribal Constitution and Bylaws, and the Menominee Tribal Bill of Rights. To give that right force, Mahkimetas argues that arraignment on Tribal charges should also trigger his Sixth Amendment right to counsel and similarly protect him from police initiated questioning.

Mahkimetas' argument that his Sixth Amendment right to counsel was violated when SA Deamron and Detective Otradovec initiated further questioning about the offenses after he was charged in tribal court relies heavily upon the Eighth Circuit's decision in *United States v. Red Bird*, 287 F.3d 709 (8th Cir. 2002). There a member of the Rosebud Sioux Indian Tribe was charged in tribal court with rape, and an attorney was appointed for him at the arraignment proceedings. The Rosebud Sioux Tribe's constitution guarantees members the right to an attorney, and the Tribe pays for an attorney when the defendant is indigent. *Id.* at 712. Sometime after his arraignment on the tribal charge, a special agent with the FBI and a tribal investigator contacted the defendant as part of the federal investigation of the same crime. The defendant waived his *Miranda* rights and gave a statement. A federal indictment was later filed charging the defendant with four counts of aggravated sexual abuse arising out of the same conduct. The defendant then moved to suppress his statement on the ground that it was taken in violation of his Sixth Amendment right to counsel. The district court granted the defendant's motion, and the Eighth Circuit affirmed. The court held

8

that because the Tribe and United States had worked in tandem to investigate the rape and since the tribal charges had the same essential elements as the federal charges, the defendant's Sixth Amendment right to counsel attached at the time of his arraignment on tribal charges in tribal court. *Id.* at 715–16. And because the defendant's statement was obtained when federal law enforcement thereafter initiated contact with the represented defendant, *Michigan v. Jackson* required the suppression of the statement. *Id.* at 716. Mahkimetas seeks to apply the same reasoning here.

There are several problems with Mahkimetas' argument. First, the Supreme Court held in *United States v. Bryant* that "the Sixth Amendment does not apply to tribal court proceedings." 136 S. Ct. 1954, 1958 (2016). Since the Sixth Amendment right to counsel does not apply to tribal court proceedings, it cannot attach at a defendant's arraignment in tribal court. The second problem with Mahkimetas' argument is that under *Michigan v. Jackson*, the bar to police initiated questioning only arises when two conditions occur: "first, the defendant's right to counsel must have attached, and second, the defendant must have invoked that right." *United States v. Krueger*, 415 F.3d 766, 775 (7th Cir. 2005). Thus, even if his Sixth Amendment right to counsel did attach, *Jackson* would not apply because, unlike the defendant in *Red Bird*, Mahkimetas did not invoke his Sixth Amendment right to counsel. The Menominee Tribe does not provide counsel to indigent defendants at tribal expense, and Mahkimetas made no effort, as far as the record shows, to retain counsel himself. Finally, and most importantly, Mahkimetas' argument fails because *Michigan v. Jackson* is no longer the law. In *Montejo v. Lousiana*, the Court overruled *Jackson*, holding that neither a defendant's request for counsel at an arraignment or similar proceeding, nor the appointment of counsel by the court, give rise to a presumption that any subsequent waiver by the defendant to police-initiated interrogation is invalid. 556 U.S. 778, 796–97 (2009). Thus, even if Mahkimetas' Sixth Amendment

9

right to counsel had attached, initiation of questioning by law enforcement thereafter is not a violation. For all of these reasons, Mahkimetas' argument under the Sixth Amendment fails.

### III.  CONCLUSION

For the reasons set forth above, Mahkimetas suffered no violation of his constitutional rights and his motion to suppress his statement is denied.

**SO ORDERED** at Green Bay, Wisconsin this 4th day of April, 2018.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court
